1
2
3
4
5
6

**REDACTED VERSION**

7

8 **UNITED STATES DISTRICT COURT**

9 **SOUTHERN DISTRICT OF CALIFORNIA**

10

11 RUBEN GARCIA,                              Case No. 08cv2357 BTM(PCL)

12                             Plaintiff,     **ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT AND DENYING CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

13        v.

14 CITY OF IMPERIAL, OFFICER A.S.
   VALENZUELA, OFFICER A. HEREDIA,
15 and DOES 1-5,                              **REDACTED VERSION**

16                             Defendants.

17

18        Defendants City of Imperial (the "City"), Officer Abel Heredia ("Heredia"), and Corporal

19 Albert Valenzuela ("Valenzuela") (collectively "Defendants") have filed a motion for summary

20 judgment or, in the alternative, partial summary judgment.  Plaintiff Ruben Garcia ("Plaintiff")

21 has filed a motion for partial summary judgment on his claims that Defendants are liable for

22 unlawful arrest under 42 U.S.C. § 1983 (First Cause of action), false arrest under California

23 law (Sixth Cause of Action), and violation of Cal. Civ. Code § 52.1 due to unlawful arrest

24 (Eighth Cause of Action).   For the reasons discussed below, Defendants' motion for

25 summary judgment is **GRANTED IN PART** and **DENIED IN PART** and Plaintiff's cross-

26 motion for partial summary judgment is **DENIED**.

27 ///

28 ///

08CV2357 BTM(PCL)

# I. **FACTS**

On November 3, 2007, at approximately 4:40 p.m., Heredia, Valenzuela, and Sergeant Ramos responded to a dispatch regarding an alleged act of graffiti at P Street and Fonzie by a Hispanic juvenile wearing a white t-shirt and black shorts. (Heredia Dep. (Ex. A to Egnatios Decl.), 92:21-97:6, 107:25-108:2.)  The three officers drove separately to the area around P and Fonzie. (Heredia Dep., 96:12-14.)

When Heredia was on Fonzie, dispatch informed the officers that the suspect was running eastbound on Mazatlan. (Heredia Dep., 111:9-13.) Heredia proceeded to Mazatlan. (Heredia Dep., 113:4-6.) Heredia was headed eastbound on Mazatlan when he saw Plaintiff, a 16-year old who was wearing a white t-shirt and dark shorts. (Heredia Dep., 113:8-10; Garcia Dep. (Ex. D to Rasmussen Decl.), 98:14-25; Ex. C to Garcia Dep.) Heredia also saw a white Ford F-250 matching the description of the vehicle driven by the witness who reported the incident. (Heredia Dep., 113:10-15.)

Heredia sped up when he saw Plaintiff. (Heredia Dep., 122:6.)  Plaintiff turned around, looked at Heredia, and sarted running. (Heredia Dep., 122:7-10.) Plaintiff cut into the yard of the house just west of 200 W. Mazatlan, and Heredia parked his car in front of the house. (Heredia Dep. 127:4-5.)  When Heredia got out of his car, Plaintiff jumped a cinder-block wall into the backyard of 200 W. Mazatlan. (Heredia Dep., 127:6-15.) Plaintiff has resided at 200 W. Mazatlan since 2003. (Garcia Decl. ¶ 2.)

The backyard of 200 Mazatlan is enclosed by an approximately six-foot cinder-block wall. (Heredia Dep., 131:7-8; Exs. B-C to Garcia Decl.) At the south-west side of the house, a chain-link gate connects the house to the wall. (Garcia Decl. ¶ 3.) Solid slats in the chain-link gate provide privacy. (Ex. B to Garcia Decl.)

Heredia claims that as Plaintiff was jumping the cinder-block wall, Heredia told Plaintiff to stop and identified himself as a police officer. (Heredia Dep., 128:13-15.) After Plaintiff jumped the wall, Heredia peeked over the chain-link gate. (Heredia Dep., 128:17-18.) Heredia claims that he told Plaintiff to stop and get on the ground but Plaintiff flipped him off and said, "F__ you." (Heredia Dep., 129:21-25.) Plaintiff denies ever "flipping the bird" or

08CV2357 BTM(PCL)

saying, "F__ you" to an officer.  (Garcia Dep. (Ex. C to Egnatios Decl.), 113:15-23.)

According to Plaintiff, after he jumped the wall, he attempted to open a side door that led to the garage, but the door was locked.  (Garcia Dep., 78:16-79:12.)  Plaintiff did not have keys to the house on him.  (Garcia Dep., 76:17-19.)  When Plaintiff realized that the door was locked, he started walking north toward the back portion of the yard.  (Garcia Dep., 79:23-24.)  At some point after Plaintiff jumped the wall, Plaintiff noticed Heredia standing at the gate, but he does not remember exactly when this was.  (Garcia Dep., 78:9-15.)  While Plaintiff was still on the side of the house, Plaintiff heard Heredia open the gate.  (Garcia Dep. 80:7-16.)  Plaintiff let Heredia know he was in Plaintiff's backyard "when he opened the gate."  (Garcia Dep., 91:24-25.)   Plaintiff does not recall whether Heredia said anything between the time Plaintiff first noticed him and the time he entered the gate.  (Garcia Dep., 80:17-20.)

Plaintiff claims he never made it to the back of the house because he was tased by Heredia.  (Garcia Dep., 80:5-6; 81:3-5.)  Plaintiff states that he was walking toward the back of the house when Heredia first told him he was going to tase him and then tased him in the back right afterward.  (Garcia Dep., 83:7-20.)  Heredia did not give Plaintiff time to comply with the warning.  (Garcia Dep., 84:13-16.)  Only a couple of seconds elapsed between the time Heredia gave his warning and Plaintiff was tased.  (Garcia Dep., 85:8-12.)  The X-26 Advanced Taser  was used in dart mode, and Plaintiff was tased for one cycle.  (Heredia Dep., 163:20-164:7; Answer ¶ 2.)  After Plaintiff was hit in the back with the taser darts, he blacked out.  (Garcia Dep., 85:17.)  When he regained consciousness, three officers helped him up and took him to a curb to sit down.  (Garcia Dep., 85:19-21.)  An ambulance and firefighters were already on the scene, and Plaintiff was taken to the hospital.  (Garcia Dep., 85:21-86:4.)

The officers tell a different story.  Heredia states that after Plaintiff jumped the wall and ignored his command to stop and get on the ground, Plaintiff headed north toward the back of the house and turned east behind the house.  (Heredia Dep., 139:3-8.)  Corporal Valenzuela was positioned behind the cinder-block wall on the east side of the property.  He

08CV2357 BTM(PCL)

was standing on top of an electrical box so he could see over the wall.  (Valenzuela Dep., 98:7-11.)  Valenzuela says that he saw Plaintiff walk north toward the back of the house, turn the corner and walk east along the back of the house, and then turn south along the east side of the house.  (Valenzuela Dep., 105:8-14.)  Valenzuela  says that he identified himself as Imperial Police and told Plaintiff to get on the ground.  (Valenzuela Dep., 108:3-5.) Plaintiff looked at Valenzuela, kept on walking south, and tried to open a sliding glass door on the east side of the house.  (Valenzuela Dep., 108:7-25.)  Plaintiff then turned back around and started walking north.  (Valenzuela Dep., 109:23-24.) Valenzuela again identified himself as Imperial Police.  (Valenzuela Dep., 108:22-24.)  Plaintiff continued to walk west along the back of the house to the west side of the house, which was when Valenzuela lost sight of him.  (Valenzuela Dep., 111:1-3.) At this point, Valenzuela jumped into the backyard. (Valenzuela Dep., 111:16.)    Valenzuela was walking toward the west side of the house when he heard the taser deployed.  (Valenzuela Dep., 112:12.)

According to Heredia, before Plaintiff reappeared on the west side of the house, Heredia heard Valenzuela say that Plaintiff had tried to open a door or window.  (Heredia Dep., 139:12-13.)  Heredia opened the gate and entered the property about the time that Garcia rounded the northwest corner of the house.  (Heredia Dep., 142:8-15.)  Heredia backed up toward the gate and told Plaintiff to stop.  (Heredia Dep., 142:17-18.)  Heredia pulled out his taser because Plaintiff was not obeying his commands.  (Heredia Dep., 142:19-20.)  Heredia told Plaintiff, "Stop, or I'll tase you."  (Heredia Dep., 142:21.)  Plaintiff started doing something with a window, and Heredia repeated, "Stop, or I'll tase you."[1]  (Heredia Dep., 142:21-23.)  Plaintiff turned around and looked at Heredia and then turned back around and walked the other way.  (Heredia Dep., 142:24-25.)  Heredia  says that he tased Plaintiff when he saw his right hand go over his crotch area.  (Heredia Dep., 143:1-2.)[2] Heredia estimates that about a half a minute passed between the time he gave his first

---

[1]  In his written report, Heredia states that he did not enter the property until he saw Plaintiff try to open the window.  (Ex. D to Egnatios Decl.)

[2]  In his written report, Heredia claims that he saw Garcia reach toward his "waist area."  (Ex. D to Egnatios Decl.)

warning that he would tase Plaintiff and the time he deployed the taser, and that about 5-10 seconds passed between the second warning and the deployment of the taser.  (Heredia Dep., 164:14-21.)

Plaintiff denies trying to enter his house through a sliding glass door and maintains that he never made it to the back of the house.  (Garcia Dep., 81:3-9.)  Plaintiff does not recall if he ever tried to open a window.  (Garcia Dep., 81:20-24.)  Plaintiff denies he was reaching toward his waist at or near the time he was shot with the taser.  (Garcia Decl. ¶ 3.)

In his First Amended Complaint, Plaintiff alleges the following causes of action: (1) violation of 42 U.S.C. § 1983 (unlawful arrest) (against Heredia and Valenzuela); (2) violation of 42 U.S.C. § 1983 (excessive force) (against Heredia); (3) violation of 42 U.S.C. § 1983 (unlawful customs or practices) (against City of Imperial); (4) negligence (against Heredia); (5) assault and battery (against Heredia); (6) false arrest (against Heredia and Valenzuela); (7) intentional infliction of emotional distress (against Heredia); (8) violation of Cal. Civ. Code § 52.1 (against Heredia and Valenzuela); and (9) supervisory liability (against the City).

## II.  STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).  A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party.  Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to

08CV2357 BTM(PCL)

establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proving at trial.  Id. at 322-23.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

Once the moving party establishes the absence of genuine issues of material fact, the burden shifts to the nonmoving party to set forth facts showing that a genuine issue of disputed fact remains.  Celotex, 477 U.S. at 314.  The nonmoving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings."  Anderson, 477 U.S. at 256.  When ruling on a summary judgment motion, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party.   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III.  DISCUSSION

**A.  42 U.S.C. § 1983 – Unlawful Arrest**

1.  Is Plaintiff's Claim Barred by *Heck v. Humphrey* or Collateral Estoppel ?

**REDACTED TEXT**

08CV2357 BTM(PCL)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27   2.  Are Defendants Entitled to Qualified Immunity?
28   Defendants contend that they did not violate Plaintiff's Fourth Amendment rights by

7

1   entering into his backyard without a warrant and that even if they did, they are entitled to

2   qualified immunity.

3        The qualified immunity inquiry consists of two prongs: (1) Taking the facts in the light

4   most favorable to the non-moving party, did the officer's conduct violate a constitutional

5   right?; and (2) If a violation occurred, was the right clearly established in light of the specific

6   context of the case?  al-Kidd v. Ashcroft, 580 F.3d 949, 964 (9th Cir. 2009); Saucier v. Katz,

7   533 U.S. 194, 201 (2001).   It is within the discretion of the court to decide which of the two

8   prongs should be addressed first in light of the circumstances in the particular case at hand.

9   Pearson v. Callahan, __ U.S. __, 129 S.Ct. 808, 818 (2009).

10       The Court believes that the best way to approach this case is by answering the

11  second inquiry first.  Accordingly, the relevant inquiry is whether, assuming Heredia and

12  Valenzuela violated Plaintiff's Fourth Amendment rights by entering into his backyard, they

13  violated clearly established law.  This inquiry focuses on the "objective legal reasonableness

14  of the action, assessed in light of the legal rules that were clearly established at the time it

15  was taken."  Wilson v. Layne, 526 U.S. 603, 614 (1999).

16       As discussed below, upon reviewing the case law and the unique facts presented in

17  this case, the Court concludes that Defendants did not violate clearly established law.

18  Heredia and Valenzuela reasonably could have believed that they could enter into Plaintiff's

19  backyard in pursuit of him without obtaining a warrant.[3]

20

21              a.  Fourth Amendment Protection of Curtilage

22       The Fourth Amendment protection against warrantless searches and seizures extends

23  _____

24       [3]  It is unclear whether Plaintiff's First Amended Complaint alleges that Defendants lacked probable cause to arrest Plaintiff for misdemeanor vandalism.  Plaintiff does not make such an argument in his summary judgment papers.  It appears to the Court that there was probable cause to arrest Plaintiff for misdemeanor vandalism based on the information given by the civilian informant who was an eyewitness, corroborating details such as the fact that the officers observed the informant in his truck in the area where the crime occurred and Plaintiff matched the informant's description, and  Plaintiff's evasive actions.  See, e.g., United States v. Angulo-Lopez, 791 F.2d 1394, 1397 (9th Cir. 1986) (explaining that a citizen informant's veracity may be established by the absence of an apparent motive to falsify and independent police corroboration of details provided by the informant).  Even if probable cause was lacking, Defendants would be entitled to qualified immunity.

8

1  to the curtilage around one's home that, like the inside of a house, "harbors the intimate
2  activity associated with the sanctity of a [person's] home and the privacies of life."  United
3  States v. Dunn, 480 U.S. 294, 300 (1987) (internal quotation marks omitted).  In determining
4  whether an outside area constitutes curtilage falling within the protection of the Fourth
5  Amendment, courts consider "the proximity of the area claimed to be curtilage to the home,
6  whether the area is included in an enclosure surrounding the home, the nature of the uses
7  to which the area is put, [and] the steps taken by the resident to protect the area from
8  observation by people passing by."  Id. at 301.  "[A] small, enclosed yard adjacent to a home
9  in a residential neighborhood is unquestionably such a 'clearly marked' area 'to which the
10  activity of home life extends,' and so is 'curtilage' subject to Fourth Amendment protection."
11  United States v. Struckman, 603 F.3d 731, 739 (9th Cir. 2010).

12       Plaintiff's backyard was adjacent to his home, was fully enclosed, and was blocked
13  from public view by solid cinder-block walls and a gate with privacy slats.  Therefore, the
14  backyard was "curtilage" and subject to Fourth Amendment Protection.

15
16                b. Exigent Circumstances

17       It is a basic principle of the Fourth Amendment that "searches and seizures inside a
18  home without a warrant are presumptively unreasonable."  Payton v. New York, 445 U.S.
19  573, 586 (1980).  The presumption of unreasonableness can be overcome, however, by a
20  showing that exigent circumstances existed.  Struckman, 603 F.3d at 738.  The exigent
21  circumstances exception allows police officers to enter a house without a warrant if (1) they
22  have probable cause to believe that a crime has been or is being committed; and (2) exigent
23  circumstances exist justifying the warrantless intrusion.  United States v. Johnson, 256 F.3d
24  895, 905 (9th Cir. 2001).  Exigent circumstances include situations involving (1) the need to
25  prevent physical harm to the officers or other persons; (2) the need to prevent the imminent
26  destruction of relevant evidence; (3) the hot pursuit of a fleeing suspect; (4) the need to
27  prevent the escape of a suspect; or (5) some other consequence improperly frustrating
28  legitimate law enforcement efforts.  Struckman, 603 F.3d at 743.  The government "bears the

08CV2357 BTM(PCL)

1   burden of showing specific and articulable facts to justify the finding of exigent

2   circumstances." United Staes v. Ojeda, 276 F.3d 486, 488 (9th Cir. 2002).

3       Plaintiff argues that it was clear under the law in existence at the time that no exigent

4   circumstances existed.  Plaintiff argues that because the officers had probable cause to

5   believe that Plaintiff had committed a misdemeanor only, the officers could not rely on "hot

6   pursuit" as a justification.  Furthermore, Plaintiff argues that the officers did not have a

7   reasonable basis for concluding that Plaintiff posed a danger to the officers or others.

8

9                    i.  Probable Cause Limited to Misdemeanor Offense

10       The officers did not have probable cause to believe that Plaintiff had or was about to

11  commit a felony.  Under Cal. Penal Code § 594(b)(1), vandalism is a felony only if the

12  damage is $400 or more.  The officers did not see the graffiti or hear any detailed description

13  about it.  Therefore, they had no basis for believing that the amount of damage was $400 or

14  more.  The officers also lacked probable cause to believe that Plaintiff was about to commit

15  burglary or attempted burglary.  Burglary requires entry into a building with "intent to commit

16  grand or petit larceny or any felony" inside the building.  Cal. Penal Code § 459.  Even if the

17  officers had reason to believe that Plaintiff was attempting to enter into a house that was not

18  his, they did not have grounds for concluding that Plaintiff intended to commit a crime inside

19  the house.  Heredia stated that although he thought Plaintiff was trying to hide or barricade

20  himself, Heredia did not believe Plaintiff was entering into the house with the intent to steal

21  anything or commit another crime in the house.  (Heredia Dep., 187:10-188:21.)

22

23                    ii.  Exigent Circumstances and Misdemeanors

24       Courts have held that exigent circumstances will rarely exist when the underlying

25  crime is a misdemeanor.  In Welsh v. Wisconsin, 466 U.S. 740 (1984), the Supreme Court

26  held that a warrantless entry into an individual's home to arrest him for driving while under

27  the influence of an intoxicant, a nonjailable offense, was in violation of the Fourth

28  Amendment.  The Supreme Court explained, "When the government's interest is only to

08CV2357 BTM(PCL)

1  arrest for a minor offense, that presumption of unreasonableness is difficult to rebut, and the

2  government usually should be allowed to make such arrests only with a warrant issued upon

3  probable cause by a neutral and detached magistrate." Id. at 750.  The Supreme Court also

4  observed, "[I]t is difficult to conceive of a warrantless home arrest that would not be

5  unreasonable under the Fourth Amendment when the underlying offense is extremely minor."

6  Id. at 753.  Relying on Welsh, the Ninth Circuit has held that an exigency related to a

7  misdemeanor "will seldom, if ever, justify a warrantless entry into the home." LaLonde v.

8  County of Riverside, 204 F.3d 947, 956 (9th Cir. 2000). See also United States v. Johnson,

9  256 F.3d 895, 908 n. 6 (9th Cir. 2001) (explaining that misdemeanor nature of the underlying

10  offense did not "definitely preclude" a finding of exigent circumstances but "weighed heavily

11  against it": "However, in situations where the underlying offense is only a misdemeanor, law

12  enforcement must yield to the Fourth amendment in all but the 'rarest' cases.").

13

14                          iii.  Lack of Clearly Established Right

15       Although case law establishes that exigent circumstances will *rarely* exist when the

16  underlying offense is a misdemeanor, it does not preclude the possibility that there may be

17  instances where even though the suspect is believed to have committed a misdemeanor

18  only, warrantless entry is justified.  Upon review of the pertinent cases, the Court concludes

19  that it was not clearly established that officers in the factual scenario presented  in this case

20  could not lawfully enter without a warrant.

21       In almost all of the cases refusing to find exigent circumstances where the underlying

22  offense was a misdemeanor, the officers either knew that the suspect lived in the home in

23  question or had no cause to believe that the suspect was not authorized to be in the home.[4]

24  In Welsh, the officers looked up the suspect's address after he abandoned his vehicle and

25  walked away from the scene, and proceeded to the suspect's house.  466 U.S. at 743.  In

26

27       [4] One exception is United States v. Johnson, 256 F.3d 895 (9th Cir. 2001), where the
     warrantless entry was onto a neighbor's property.  However, Johnson is distinguishable
28  because the officers were not in hot pursuit of the suspect, had not seen the suspect enter
     the neighbor's property, and had no real reason to think the suspect was there.  In fact, the
     suspect was not found on the property.

08CV2357 BTM(PCL)

1   LaLonde, the officers went to LaLonde's house in response to an excessive noise complaint

2   by a neighbor. 204 F.3d at 95-51.  In Hopkins v. Bonvicino, 573 F.3d 752, 760 (9th Cir.

3   2009), police were called by a woman who was involved in a minor traffic accident with

4   Hopkins and, unbeknownst to Hopkins, followed Hopkins to his home.

5          Plaintiff relies heavily on King v. City of Fort Wayne, 590 F. Supp. 414 (N.D. Ind.

6   1984), in which the court held that hot pursuit did not justify officers' warrantless forced entry

7   into the home of King, who was suspected of committing misdemeanors.  The officers began

8   pursuing King while he was driving his vehicle in excess of the speed limit.  King kept driving

9   even after the officers turned on their lights, so the officers followed him.  King eventually

10  pulled into a parking area located in front of a house and got out of his car.  After a brief

11  conversation with one of the police officers, King quickly walked away and entered the

12  residence through the front door.  Although the court noted that the defendant police officers

13  did not know who owned the residence into which Mr. King entered, id. at 423 n. 5, there

14  were no facts suggesting that he did not own the residence, and the officers did not claim

15  that they were worried that he did not live there.

16         United States v. Struckman, 603 F.3d 731 (9th Cir. 2010), is the case that is the most

17  factually similar to this case.  In Struckman, a woman called the police reporting that her

18  neighbors were not at home and that a white male had thrown a red backpack over the

19  neighbors' fence and had climbed into the backyard.  It turns out that the suspect lived in the

20  house.  The Ninth Circuit expressed doubt that there was probable cause to believe that

21  Struckman was engaged in criminal trespass because there was no confirmation that

22  Struckman was not authorized to be in the yard.  The caller did not say she knew all of the

23  occupants of the house and "innocent reasons could have explained what she did see,

24  including the actual explanation – a family member who lived at the house did not have his

25  key." Id. at 742.  Furthermore, the officers could have, but did not, ask him if he lived there

26  and what he was doing in the backyard. Id.  The Ninth Circuit held that even assuming there

27  was probable cause to believe that Struckman was guilty of criminal trespass, there were no

28  exigent circumstances justifying warrantless entry because there was no evidence that

anyone was in danger (Struckman was just standing in the yard and there were no indications that Struckman had entered or attempted to enter the house and no evidence that anyone was nearby), the suspected offense was a misdemeanor and not inherently dangerous, and any questions regarding whether Struckman lived there could have been dissipated by minimal inquiry at the outset.  Id. at 745-46.

The facts of this case are distinguishable from Struckman.  In this case, the police officers were in hot pursuit of Plaintiff, who fled when he saw Heredia.  In the course of his flight, Plaintiff jumped over the wall into the backyard.  It would be reasonable to infer from these facts that Plaintiff had jumped into a random backyard to evade the police and avoid arrest.  Plaintiff claims that he told Heredia he was in Plaintiff's backyard "when [Heredia] opened the gate." (Garcia Dep. 91:24-25.)  It is unclear whether Plaintiff told Heredia he was in Plaintiff's backyard as Heredia was opening the gate or after he had opened the gate and entered the backyard.  But even if Plaintiff told Heredia that he was on Plaintiff's property before he entered the yard, Heredia had reason to distrust this claim given Plaintiff's evasive conduct.

Because Heredia and Valenzuela had cause to think that Plaintiff was not authorized to be in the backyard, they also had a reasonable fear that Plaintiff posed a potential danger to others.  Plaintiff was not being cooperative.  He had run away after spotting Heredia.  In addition, after Plaintiff jumped over the wall, he did not comply with Heredia's command to stop and get on the ground.[5]

The officers  reasonably feared that Plaintiff might try to enter the house.  Although there is a triable issue whether, before entering into the backyard, the officers saw Plaintiff try to enter the house or had grounds for believing that Plaintiff had attempted to enter the

---

[5]  Plaintiff does not recall whether Heredia said anything before Heredia opened the gate.  (Garcia Dep., 80:17-20).  However, "failure to remember and lack of knowledge are not sufficient to create a genuine dispute."  Fed. Election Comm'n v. Toledano, 317 F.3d 939, 950 (9th Cir. 2002).

house,[6] the Court still concludes that the officers had cause to be concerned that Plaintiff might try to enter the house.  The yard on the west side of the house was approximately four or five feet wide.  (Heredia Dep., 130:14-19.)  Plaintiff was very close to a door (which he admittedly tried to open) and a window (which he tried to open later).[7]  From the officers' point of view, Plaintiff had already jumped into a yard to escape from them and might very well try to enter the house to continue his flight or barricade himself in.  Plaintiff could enter the house in seconds, whether by force or just opening an unlocked door or window.  It is true that the officers did not know if anyone was in the house and did not believe that Plaintiff had a specific intent to harm anyone inside.  However, there was the real risk that if Plaintiff got inside the house and surprised someone inside, someone could get hurt.  Delaying entry in an effort to obtain a warrant or to attempt confirmation that Plaintiff lived in the house would provide a window of opportunity for this type of scenario to unfold.

Even though exigent circumstances will *rarely* exist when the underlying offense is a misdemeanor, case law leaves open the possibility that there may be situations where warrantless entry is justified.  In fact, there are cases where courts have found exigent circumstances even though the underlying offense was a misdemeanor.  For example, in United States v. Rohrig, 98 F.3d 1506 (6th Cir. 1996), the Sixth Circuit found that very loud music in the early morning hours, which was disturbing neighborhood peace, constituted exigent circumstances.  The Sixth Circuit explained that even though the facts of the case did not neatly fit into an existing category of exigent circumstances, "[n]one of the presently recognized exigencies can claim any special constitutional status; instead, *each was a*

---

[6]  Plaintiff admits to trying to open a side door into the garage after jumping over the wall.  But neither Heredia or Valenzuela said they saw Plaintiff do this.  Valenzuela says he saw Plaintiff try to open a sliding glass door on the east side of the house, but Plaintiff denies doing this.  Heredia claims that Valenzuela told him over the radio that Plaintiff had attempted to open the sliding glass door.  According to Plaintiff, however, he never even turned the corner from the west side of the house into the back portion of the yard.  Therefore, Heredia would have seen him the whole time and would have known that he had not tried to open a sliding glass door.  Although Heredia's report states that Plaintiff attempted to open the window *before* he opened the gate, during his deposition, Heredia said that Plaintiff attempted to open the window *after* he entered the backyard.

[7]  Plaintiff does not remember if he tried to open the window.  (Garcia Dep., 81:20-24.)  Again, failure to remember does not create a genuine dispute.

08CV2357 BTM(PCL)

1    *product of distinct and independent analysis of the facts of a particular case in light of*

2    *underlying Fourth Amendment principles.*"  Id. at 1519.  (Emphasis added.)

3        Even more on point, in United States v. Lenoir, 318 F.3d 725 (7th Cir. 2003), an officer

4    saw Lenoir, who appeared to be intoxicated, carrying a shotgun, a rifle, and an ammunition

5    magazine for the rifle that appeared capable of holding over twenty rounds.  Indiana law did

6    not prohibit Lenoir from carrying the guns, but a city ordinance prohibited possession of an

7    ammunition magazine of this capacity.  Although the officer could not arrest Lenoir for

8    violating city ordinances, the officer followed Lenoir and called for backup.  When Lenoir saw

9    police cars, he fled to his home a short distance away.  It appears that Lenoir entered

10   through the front door but "had trouble" entering the home.  The officer followed closely

11   behind without knocking or seeking permission to enter.  The court held that exigent

12   circumstances existed because the police were not aware that Lenoir was entering his own

13   home and reasonably feared for the safety of occupants in the home and for their own safety.

14   Id. at 730.

15       In this case, there were no guns or weapons, and Plaintiff did not appear intoxicated.

16   Nonetheless, the reasoning of Lenoir arguably applies:

17           By delaying entry into the home, in order to find out if Lenoir lived there, police
             would have risked giving Lenoir the opportunity to harm police or whomever
18           was inside. . . .  We will not force police to risk the safety of others or
             themselves when the circumstances and a suspect's behavior create a
19           reasonable belief that they or someone inside may be in danger.

20   318 F.3d at 730.  Police "need not wait for screams from within in order to fear for the safety

21   of occupants or themselves."  Id.

22       In 2007, the law was clear that where there is probable cause to believe that an

23   individual has committed or is committing a misdemeanor only, an officer ordinarily may not

24   enter into the individual's home without a warrant solely to arrest the individual or to

25   investigate the misdemeanor.  See, e.g., Hopkins, 573 F.3d at 772 (holding that law was

26   clearly established that officers could not enter Hopkins' home without a warrant to

27   investigate a potential misdemeanor drunk-driving incident).  However, the law was not

28   clearly established with respect to whether exigent circumstances may exist under the unique

facts of this case.  In other words, it was not clear whether exigent circumstances exist where a suspect in a misdemeanor case flees to a home that officers do not know is his, enters the backyard by jumping over a wall, and ends up in close proximity to points of entry into the residence, which may or may not be occupied.

Based upon the totality of the circumstances, Heredia and Valenzeula had a reasonable belief that they could enter Plaintiff's backyard without a warrant and are entitled to qualified immunity.  Accordingly, the Court grants summary judgment in favor of Heredia and Valenzuela on Plaintiff's § 1983 unlawful arrest claim.

**B.  42 U.S.C. § 1983 - Excessive Force**

1.  Did Heredia's Use of the Taser Against Plaintiff Constitute Excessive Force?

Claims of excessive force are examined under the Fourth Amendment's prohibition on unreasonable seizures.  Graham v. Connor, 490 U.S. 386, 394 (1989).  The officers' actions are evaluated under the standard of objective reasonableness.  Id. at 397.  The court must carefully balance "the nature and quality of the individual's Fourth Amendment interests" against "the countervailing governmental interests at stake."  Id. at 396.  Stated another way, "[t]he force which [i]s applied must be balanced against the need for that force."  Liston v. County of Riverside, 120 F.3d 965, 976 (1997).

a.  Nature and Quality of the Intrusion

Heredia's use of the X-26 Advanced Taser in dart mode against Plaintiff constituted an "intermediate, significant level of force that must be justified by a strong government interest [that] *compels* the employment of such force."  Bryan v. MacPherson, __ F.3d __, 2010 WL 2431482, at * 4 (9th Cir. 2010) (internal quotation marks and citation omitted).  As explained by the Ninth Circuit, the X26 Taser delivers a 1200 volt, low ampere electrical charge that instantly overrides the victim's central nervous system and paralyzes the muscles throughout the body.  Id. at * 3.   The pain is intense and felt throughout the body, and can result in immobilization, disorientation, loss of balance and weakness, even after the

1  electrical current has ended.  Id. at * 4.

2

3

4               b.  Governmental Interest in the Use of Force

5        The government's interest in the use of force is measured by factors including: (1) the

6  severity of the crime at issue; (2) whether the suspect posed an immediate threat to the

7  safety of the officers or others; and (3) whether he was actively resisting arrest or attempting

8  to evade arrest by flight.  Graham, 490 U.S. at 396.  These factors are not exclusive, and the

9  court must examine the totality of the circumstances and consider whatever specific factors

10  may be appropriate in that particular case.  In Bryan, the Ninth Circuit also considered the

11  facts that (1) the officer failed to warn Bryan that he would be shot with the taser if he did not

12  comply with the order to remain in the car; and (2) the officer did not consider alternate less

13  intrusive means of effecting Bryan's arrest.  Bryan, 2010 WL 2431482, at * 9.

14        As discussed above, the officers did not have reason to believe that Plaintiff had

15  committed a felony.  The officers had probable cause to arrest Plaintiff for nonviolent

16  misdemeanors only.

17        The evidence does not establish that Plaintiff posed an immediate threat to the safety

18  of the officers or others.[8]  Heredia did not see any weapons on Plaintiff and did not believe

19  he had a weapon. (Heredia Dep., 136:10-12.)  Any belief by Heredia that Plaintiff could have

20  been in a "tagging" group and that members of a tagging group might carry a weapon of

21  some sort to defend themselves (Heredia Dep., 102:9-105:5), would not support the

22  conclusion that Plaintiff likely had a weapon on him.  Furthermore, Plaintiff did not make any

23  verbal threats or violent physical gestures.  Although Heredia saw Plaintiff attempt to open

24  a window, Plaintiff was unsuccessful.  The possibility that Heredia could attempt entry at

25  another window or door (by force or without) and the possibility that there were people inside

26  the house did not rise to the level of an *immediate* threat to the safety of others.  There was

27  _____

28        [8]  Although Plaintiff did not pose an *immediate* threat to the safety of others, as
previously discussed, it was reasonable for the officers to believe that Plaintiff potentially
posed a threat to others.

1   also no immediate threat to Heredia because Plaintiff was walking away from Heredia when

2   Heredia shot him with the taser.

3        Plaintiff was attempting to evade arrest by flight.  He ran away from Officer Heredia.

4   In addition, after he jumped over the wall, he failed to comply with Heredia's command that

5   he stop and get down on the ground.  Although Plaintiff may have tried to run again after

6   Heredia entered the backyard, Plaintiff was in an enclosed area and virtually surrounded,

7   with Heredia at the west of the house, Valenzuela at the east of the house, and Ramos

8   nearby.

9        It does not appear that Heredia considered other means of effecting arrest.  (Heredia

10  Dep., 144:22-145:7.)  In Bryan, the Ninth Circuit observed, "[Officer MacPherson] was, or

11  should have been, aware that the arrival of [other] officers would change the tactical calculus

12  confronting him, likely opening up additional ways to resolve the situation without the need

13  for an intermediate level of force."  Bryan, 2010 WL 2431482, at * 9.  Because Valenzuela

14  was very close by and Heredia was in radio contact with the other officers, it seems that less

15  intrusive alternatives were available, especially given Plaintiff's relatively slight stature (5'7"

16  tall and only 130 pounds (Answer ¶ 16)).

17       The most significant factor in the Court's opinion is the lack of an adequate warning.

18  Viewing the disputed facts in the light most favorable to Plaintiff, see Antoine v. North Central

19  Counties Consortium, 605 F.3d 740, 745 (9th Cir. 2010), even though Heredia gave a

20  warning before deploying the taser, he did not give Plaintiff sufficient time to comply.  Giving

21  a warning without sufficient time to comply is tantamount to not giving a warning at all.  In

22  light of the lack of immediate danger to the officers or others, there was no reason at all not

23  to give a warning along with sufficient time to comply.  See Deorle v. Rutherford, 272 F.3d

24  1272, 1284 (9th Cir. 2001) ("There was ample time to give that order or warning and no

25  reason whatsoever not to do so.")

26

27            c.  Balancing the Competing Interests

28       Considering the facts in the light most favorable to Plaintiff and the factors discussed

above, the intermediate use of force by Heredia was not warranted.  Plaintiff, an unarmed juvenile, was suspected to have committed a non-violent misdemeanor.  Although he fled from the police and jumped into a backyard of a house, Plaintiff did not pose an immediate threat to the officers or anyone else.  The proximity of other officers and the fact that Plaintiff was in an enclosed area suggest that less-invasive means of effecting arrest were available and should have been considered.  Most importantly, there was no reason why an adequate warning could not have been given before deploying the taser.  Therefore, the Court concludes that a jury could find that the intermediate level of force employed by Heredia against Plaintiff was excessive.

### 2.  Is Heredia Entitled to Qualified Immunity?

The Court now turns to the question whether Heredia is entitled to qualified immunity in connection with Plaintiff's excessive force claim.  The Court finds that he is.

In Bryan, Bryan was stopped by police for not wearing his seatbelt.  He was angry with himself because he had already gotten a speeding ticket that day, and was clearly agitated.  Officer MacPherson claimed that he told Bryan to remain in the car, but Bryan testified that he did not hear Officer MacPherson tell him to do so.  After stepping outside of his car, Bryan began yelling gibberish and hitting his thighs.  He was wearing only his boxer shorts and tennis shoes.  He was standing, without advancing, and was not attempting to flee.  Officer MacPherson was standing twenty to twenty-five feet away from Bryan.  Without giving any warning, Officer MacPherson shot Bryan in the back with his taser gun.

The Ninth Circuit found that although Officer MacPherson violated Bryan's right to be free from excessive force, MacPherson was entitled to qualified immunity because he reasonably could have believed his use of the taser against Bryan was constitutional.  Bryan, 2010 WL 2431482, at * 10.  The Ninth Circuit explained that although there was established law placing MacPherson on fair notice that an intermediate level of force was unjustified under the circumstances of the case, the law was not clearly established that use of a taser constitutes an intermediate level of force:

> However, as of July 24, 2005, there was no Supreme Court decision or decision of our court addressing whether the use of a taser, such as the Taser X26, in dart mode constituted an intermediate level of force. Indeed, before that date, the only statement we had made regarding tasers in a published opinion was that they were among the "variety of non-lethal 'pain compliance' weapons used by police forces." San Jose Charter of Hells Angels Motorcycle Club, 402 F.3d at 969 n. 8.

Id. at 629.

Before Bryan was decided, it was unclear whether use of a Taser X26 in dart mode constituted an intermediate level of force or something less. Furthermore, as of 2007, neither the Ninth Circuit nor the Supreme Court had decided an excessive force case involving the use of a taser. Therefore, the Court simply cannot say that a reasonable officer would have known that use of a taser in the situation confronting Heredia was unlawful. Indeed, the use of force in this case is more understandable than the use of force in Bryan. In Bryan, Bryan was standing in one place and was twenty to twenty-five feet away from the officer. No other civilians were close by. In contrast, in this case, Plaintiff jumped over a wall into a backyard while running away from the police, failed to comply with an officer's command to stop and get on the ground, walked away from the officer, and attempted to open a window to a home that could have been occupied. Heredia's conduct was not objectively unreasonable in light of clearly established law at that time.

## C. 42 U.S.C. § 1983 - Municipal Liability

Plaintiff seeks to impose liability against the City for any violation of Plaintiff's Fourth Amendment rights. Plaintiff claims that the City had an unlawful custom or practice of permitting or condoning unlawful seizures, improper use of tasers, and excessive use of force. (FAC ¶ 45.) Plaintiff also claims that the City has an unlawful custom and practice of inadequate training, supervision and/or disciplining of officers who improperly use tasers or conduct unlawful searches and seizures. (FAC ¶¶ 44-45.)

Under Monell v. Dep't of Soc. Serv. of City of New York, 436 U.S. 658, 691 (1978), a municipality may be held liable under § 1983 only where an "action pursuant to official municipal policy of some nature causes a constitutional tort." Municipal liability under Monell

is established where "the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy." Bd. of County Comm'rs v. Brown, 520 U.S. 397, 417 (1997). Inadequate training can be the basis of Monell liability if it "reflects a 'deliberate' or 'conscious' choice by a municipality" not to avoid the risk of harm. City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989).

Plaintiff has not come forward with evidence establishing the existence of an unlawful custom or practice of permitting or condoning Fourth Amendment violations or evidence of inadequate training. Plaintiff's expert, Roger Clark, opines that Heredia and Valenzuela failed to follow POST (Peace Officer Standards and Training) training, which is provided to each and every officer, regarding the proper tactics and procedures in dealing with non-violent, misdemeanor juvenile subjects. (Clark Decl. ¶ 7.) Clark further opines that Heredia's use of the taser was an unnecessary and excessive use of force. (Clark Decl. ¶¶ 9-14.) In addition, Clark points out mistakes he believes Valenzuela made in connection with the investigation and documentation of the incident. Clark explains that Valenzuela did not write a report until ordered to do so (approximately a month after the incident occurred), and that once Valenzuela finally submitted his report, he was formally reprimanded for failing to submit a complete report. (Clark Decl. ¶ 15.) Clark also explains that Valenzuela made errors during the investigation, including failing to take pictures showing where foot prints were located in relation to the graffiti, failing to try to recover the spray can, and failing to interview the witness. (Clark Decl. ¶ 16.)

Even assuming Heredia and Valenzuela violated Plaintiff's constitutional rights, failed to follow proper POST training procedures, and conducted a sloppy investigation of the underlying offense, there is no evidence that the officers' conduct was attributable to a deliberate policy of the City. There is no evidence that any mistakes made by the officers were due to a lack of training or an unspoken policy of permitting or condoning constitutional

08CV2357 BTM(PCL)

1   violations.[9]  See Harris, 489 U.S. at 391 ("[A]dequately trained officers occasionally make

2   mistakes; the fact that they do says little about the training program or the legal basis for

3   holding the city liable.")  Moreover, even if the evidence supported the conclusion that

4   Heredia and Valenzuela were not trained properly, Plaintiff still fails to establish deliberate

5   indifference on the part of the City.  See Blankenhorn v. City of Orange, 485 F.3d 463, 484-

6   85 (9th Cir. 2007) (explaining that "absent evidence of a program-wide inadequacy in

7   training, any shortfall in a single officer's training can only be classified as negligence on the

8   part of the municipal defendant," which does not rise to the deliberate indifference required

9   for Monell liability) (internal quotation marks omitted).

10       Plaintiff has failed to raise a genuine issue of material fact with respect to the City's

11   liability under Monell.  Therefore, the Court grants summary judgment in favor of the City on

12   Plaintiff's Monell claim.

13

14   **D.  State Law Claims**

15           1.  State Law Claims Premised on False Arrest

16       In connection with his allegation that he was unlawfully arrested, Plaintiff asserts

17   causes of action for false arrest against Heredia and Valenzuela, violation of Cal. Civ. Code

18   § 52.1 against Heredia and Valenzuela, and supervisory liability against the City.

19       Cal. Penal Code § 847(a) provides, "There shall be no civil liability on the part of, and

20   no cause of action shall arise against, any peace officer or federal criminal investigator or law

21   enforcement officer . . . acting within the scope of his or her authority, for false arrest or false

22   imprisonment arising out of any arrest under any of the following circumstances: (1) The

23   arrest was lawful, or the peace officer, at the time of the arrest, had reasonable cause to

24   believe the arrest was lawful."

25       Under California law, it was lawful for Heredia and Valenzuela to enter into Plaintiff's

26

27       [9]  After discussing Valenzuela's mistakes during the investigation of the underlying
    crime, Clark states "I have noted no administrative investigation into these facts in this
    regard."  (Clark Decl., ¶ 17.)  It is unclear what facts Clark is referring to.  In addition, it is

28   unclear whether Clark had access to all of the documents that would indicate whether or not
    there was an administrative investigation into the facts in question.

backyard because they were in hot pursuit of him after attempting to detain him in a public place.  The California Court of Appeal has held that where police are in hot pursuit of a suspect after initiating a detention or arrest in a public place, a warrantless entry into a home is lawful even if the underlying offense is a misdemeanor.  People v. Lloyd, 216 Cal. App. 3d 1425 (1990).  Lloyd distinguished Welsh, 466 U.S. at 749-50, on the ground that in Welsh, there was no arrest set in motion in a public place before the warrantless entry.  See also In re Lavoyne M., 221 Cal. App. 3d 154 (1990) (holding that exigency of hot pursuit justified warrantless entry into home of a minor who was driving without a license).

Plaintiff argues that the Court must ignore Lloyd and Lavoyne because the cases contradict law established by the California Supreme Court.  The Court has reviewed the California Supreme Court cases cited by Plaintiff and does not see any contradiction.  In People v. Thompson, 38 Cal. 4th 811 (2006), the court explained that the presumption of unreasonableness that attaches to a warrantless entry into the home can be overcome by a showing of one of the few specifically delineated exceptions to the warrant requirement *"such as* 'hot pursuit of a fleeing felon, or imminent destruction of evidence, . . . or the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling.'"  Id. at 818 (quoting Minnesota v. Olson, 495 U.S. 91, 100 (1990)) (emphasis added).  Thompson did not address whether hot pursuit of an individual suspected of a misdemeanor can constitute an exception to the warrant requirement.  Similarly, in People v. Smith, 63 Cal. 2d 779 (1966), a case dealing with pursuit of a suspect who had just killed two policemen, the California Supreme Court explained, "The law recognizes that fresh pursuit of a fleeing suspect who has committed a grave offense and remains dangerous to life and limb may constitute 'exceptional circumstances' sufficient to justify a search without a warrant."  Id. at 797.  Again, the California Supreme Court did not discuss whether exceptional circumstances may exist when officers are in hot pursuit of a suspect believed to have committed a misdemeanor.

According to the facts before the Court, Heredia attempted to detain Plaintiff before Plaintiff took refuge in his backyard.  Heredia followed Plaintiff in his police car and, once he

23

1  got out of his car, identified himself as a police officer and ordered Plaintiff to stop just as
2  Plaintiff was jumping the wall.  Therefore, under California law, it was lawful for Heredia and
3  Valenzuela, who were in hot pursuit of Plaintiff, to enter into Plaintiff's backyard without a
4  warrant.

5      Because Plaintiff's arrest was lawful under California law (or, at the very least, the
6  officers had reasonable cause to believe the arrest was lawful), Heredia and Valenzuela
7  qualify for statutory immunity under Cal. Penal Code § 847(a).  Accordingly, the Court grants
8  summary judgment in favor of Heredia and Valenzuela on Plaintiff's claims for false arrest and
9  violation of Cal. Civ. Code § 52.1,[10] and in favor of the City on Plaintiff's claim for supervisory
10  liability as it relates to the lawfulness of the arrest.[11]

11

12      2.  State Law Claims Premised on Excessive Force

13      Based on Heredia's use of the taser against him, Plaintiff asserts claims of negligence,
14  assault and battery, intentional infliction of emotional distress, and supervisory liability.

15      Although the Court has found that Heredia is entitled to qualified immunity in
16  connection with Plaintiff's § 1983 excessive force claim, Heredia is not immune under
17  California law.  Under California law, immunity is not extended to police officers who use
18  excessive force in arresting a suspect.  See Scruggs v. Haynes, 252 Cal. App. 2d 256, 257
19  (1967) (explaining that a police officer does not have discretionary immunity under Cal. Gov't
20  Code § 820.2 from liability for the use of unreasonable force in making an arrest); Robinson
21  v. Solano County, 278 F.3d 1007, 1016 (9th Cir. 2002) (affirming grant of qualified immunity
22  in connection with § 1983 excessive force claim but reversing grant of summary judgment on
23  state law claims arising from excessive force allegations because "California denies immunity
24  to police officers who use excessive force in arresting a suspect.").

25  _____

26  [10]  When deciding whether defendants are immune from claims brought under Cal.
27  Civ. Code § 52.1, courts have looked to statutory immunities applicable to government tort
   claims generally.  Venegas v. County of Los Angeles, 153 Cal. App. 4th 1230, 1243 (2007).

28  [11]  Under California law, immunity is granted to counties only where the public
   employee is also immune.  Cal. Gov't Code § 815.2(b).

08CV2357 BTM(PCL)

1    As discussed above, viewing the facts in the light most favorable to Plaintiff, Heredia's

2  use of the taser against Plaintiff constituted excessive force.  Therefore, Heredia is not entitled

3  to summary judgment on Plaintiff's claims for negligence, assault and battery, and intentional

4  infliction of emotional distress, and the City is not entitled to summary judgment on Plaintiff's

5  claim for supervisory liability as it relates to the use of excessive force.

6

7                              IV.  **CONCLUSION**

8    For the reasons discussed above, Defendants' motion for summary judgment [Doc. No.

9  60] is **GRANTED IN PART** and **DENIED IN PART**.  Summary judgment is granted in favor

10  of Defendants on Plaintiff's first cause of action (42 U.S.C. § 1983 - false arrest), second

11  cause of action (42 U.S.C. § 1983 - excessive force),  third cause of action (42 U.S.C. § 1983

12  - unlawful customs or practices), sixth cause of action (false arrest), eighth cause of action

13  (violation of Cal. Civ. Code § 52.1), and ninth cause of action (supervisory liability) to the

14  extent that it pertains to the lawfulness of Plaintiff's arrest.  Defendants' motion is **DENIED** as

15  to Plaintiff's fourth cause of action (negligence), fifth cause of action (assault and battery),

16  seventh cause of action (intentional infliction of emotional distress), and ninth cause of action

17  (supervisory liability) to the extent that it pertains to the use of excessive force.  Plaintiff's

18  motion for summary adjudication of liability [Doc. No. 80] is **DENIED**.

19  **IT IS SO ORDERED.**

20

21  DATED:  September 14, 2010

22

23                              Honorable Barry Ted Moskowitz
                                United States District Judge
24

25

26

27

28

25